UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

    vs.    CRIMINAL NO. 3:20-CR-27(MPS)

ERIC MONTANEZ    July 14, 2020

### **DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Eric Montanez finds himself in this position as a result of tragic character flaws. Having overcome the limitations of a childhood of privation and neglect, he acquired a solid, middle-class job and began a family. But he was injured in course of his work and became addicted to opioid pain killers as result. A proud man with a history fending for himself and his loved ones, the trappings of childhood poverty died hard when adult desperation struck. Many of the traits and circumstances that helped Eric transcend his early-life struggles, and bulwark against criminality, ill-served him when challenge struck his adult life. Too proud to ask for help, Eric isolated himself in the family car, took to the roads of multiple states at night, and stole from cellular telephone merchants. Each subsequent morning brought a fresh supply of OxyContin as he traded the merchandise for drugs and drug money.

But since his arrest, Eric has been working to make amends for his crimes and address the raw edges of his character that led him to this place. He is in the process of confronting that childhood—one that saw him abandoned on the streets of San Juan, Puerto Rico for nearly a year as a 10 year-old boy. He completed inpatient drug treatment where he was elected a leader amongst group members' for his insight and contributions to the group. Accomplishments such as this one—in the greater context of Eric's life and this case, warrant a significantly below guidelines sentence or downward departure. He addresses the circumstances of his upbringing, his offense, and the balance of the 18 U.S.C. §3553a factors in this memo and in support of a below guidelines sentence.

### I. THE FACTORS SET FORTH IN 18 U.S.C. §3553(A) WARRANT A NON-GUIDELINES SENTENCE OR A SUBSTANTIAL DOWNWARD DEPARTURE.

A non-Guidelines sentence or significant downward departure is a "sufficient but not greater than necessary" to accomplish the statutory purposes of sentencing. *See* 18 U.S.C. § 3553(a). This is so for several reasons. First, Mr. Montanez's upbringing is a story of profound neglect and isolation—punctuated by 10 months of abandonment on the street of San Juan, Puerto Rico—at the hands of a drug addicted mother and absentee father. The effects of that trauma are visible in this crime. Second—and a corollary of the first, Mr. Montanez has substantially rehabilitated himself at this point and application of the extraordinary rehabilitation departure, or a non-guidelines sentence acknowledging this fact, is appropriate. *See United States v. Hawkins*, 228 Fed.Appx. 107, (2d Cir., 2007)(affirming sentence of probation granted on extraordinary rehabilitation grounds while *Booker* was pending where district indicated it would grant non-guidelines sentence on remand for role in health care fraud conspiracy with $148,814). Mr. Montanez addresses each of these bases through the lens of relevant 18 U.S.C. §3553(a) factors.

**A. Nature And Circumstances Offense.**

This offense constitutes, essentially, a series of a burglaries of name-brand cellular phone merchants. The defense does not dispute that the scope of the offense is substantial in terms of the number of stores burglarized and wares taken. *PSR*, ¶¶ 9-32. However, the quantitative descriptions of the offense—the number of merchants burglarized and the loss amounts—are set forth in the stipulation of offense conduct. Rather than restate that information, the defense uses this opportunity to set forth qualitative nature of the offense which is materially the same for each burglary.

Eric Montanez was in throws of addiction and unemployment in the spring of 2019. Rather than taking more constructive steps, which he addresses herein, he incrementally entered the black

2

market for cellular telephones. In the months before Mr. Montanez was laid off from his job on November 12, 2018, the event that precipitated this turn in his life, *infra*, he was at a gas station with his mother in Springfield, MA; the two were stopped to address car trouble. While there, Mr. Montanez was approached by a childhood acquaintance whom he had not seen in decades. The individual had been in prison at some point in his early 20s and Mr. Montanez, then in his late 30s, had not seen him since his high school years. After exchanging pleasantries and catching up, the individual gave Mr. Montanez a business card and told him "I buy phones."

This was the first step down the path that concludes at this sentencing. Subsequent, to the loss of his job in November 2018 and relapsing on pain medication, Mr. Montanez called this individual to ask him how that worked. The gentleman recruited unwitting people to go into a cell phone store and open an account that included the purchase or lease of a phone on credit. The person would then hand the phone over to this gentleman for cash. The gentleman would then resell the phones on the black market. Mr. Montanez participated in this scheme by opening two accounts himself and recruiting two other individuals to do the same. Mr. Montanez was paid $100 for each other person who opened an account. In the course of these transactions Mr. Montanez was told that there was an opportunity to take a more active role in "gathering" phones for black market resale.

Mr. Montanez learned that there was a demand for people to break into cellular telephone stores in the middle of the night and steal all of the display merchandise (and frequently any other easily accessible electronics). That merchandise was then resold to individuals, who much like the earlier scheme, would pay cash for the phones and reap black market profits from them. Accordingly, Mr. Montanez would leave his wife and daughter at home many nights. He drove the roads of Connecticut, New York, New Jersey, Rhode Island, and Massachusetts stopping at now ubiquitous cellular phone stores-Verizon, Sprint, T-Mobile, etc—breaking the front window with a hammer, and

3

gathering the readily available merchandise in a bag. Sometimes he hit two stores in one night. Each morning, he would deliver the phones to a black market merchant and sell the phones for cash or trade the merchandise for drugs.

Clearly, this is not acceptable and the defense does not contend otherwise. However, there are several mitigating factors worthy of brief notation. First, this is neither the first nor the last instance in which a defendant has stolen for drug money. Notably absent this fact pattern are the threats to life and limb attendant similar crimes: no one was held at gun point (nor was a weapon present) nor did Mr. Montanez target homes or occupied locations. Second, the loss amount is noteworthy—in excess of $400,000. Unlike, perhaps many white collar crimes with similar numbers, Mr. Montanez did not take that sum all at once nor did he target uniquely vulnerable victims: the individual numbers at issue are significant but the aggregate loss was reached incrementally. Stealing $400,000 dollars is undoubtedly serious but this offense lacks the threat of violence and brashness other offenses of a similar character frequently possess.

### B. History And Characteristics Of The Defendant.

The presentence report makes clear that Mr. Montanez was born into a relationship that quickly failed. *See PSR*, ¶63. Thereafter, he was raised by a drug addicted mother and absentee father to chronic neglect. *Id*. 64. This is highly significant. But, rather than restate the PSR, Mr. Montanez uses this section to amplify several points that may not be fully captured in the prosaic, albeit accurate, delivery of a PSR.

> **1. Not only was neglect and isolation a constant in Mr. Montanez's childhood, it was punctuated by abandonment in foreign land.**

Remarkable in a childhood of stunning deprivation is the fact that Mr. Montanez was abandoned on the streets of San Juan, Puerto Rico at the age of 10. His mother, who had been on the

4

run from the law,[1] was apprehended and sent back to the mainland United States. ¶ 64. Alone on the streets of a foreign land, Eric was forced to sell kites on the streets and pick fruit off trees to survive. ¶ 64. He slept on the floor of a stranger's house for ten months with no food. *Id*. While the drama of this circumstance is obvious, the unassuming way in which Mr. Montanez recalls it is also illustrative: "There was one incident that still affects me when I think about it." ¶64. Mr. Montanez's reluctance or inability to relate this event for what it was—a highly traumatic event that, standing alone, could irreparably damage a child—as something only slightly outside of normal is telling. First, it demonstrates that his experience of "normal" is so skewed that this event only registers as slightly abnormal. Second, even at the age of 40 Mr. Montanez struggles to find that language and tone that captures the gravity of the event of which he speaks. This demonstrates a struggle to process the horrendous things that happened to him and put those experiences and consequent emotions into the form—language—that connects him to the people who can help him overcome those experiences. The isolation that was cast upon him as a boy is only reinforced as a man because his experience is so alien to most that even acknowledging it is a struggle.

The streets of San Juan that 10 year-old Eric walked, alone, were no kinder than any other part of this life. San Juan of the late 1980s was a haven for drugs and violent crime. "High murder rates are not unusual in Puerto Rico. Between 1980 to 2005 the average annual homicide rate was 19 per 100,000 in Puerto Rico and 8 per 100,000 on the mainland." L. Alvarez "*Murder Rate and Fear Rise in Puerto Rico*," N.Y. Times, June 20, 2011 available at

---

[1] The full contours of his mother's legal troubles are not clear but in addition to the frequency, it appears some were serious. Mr. Montanez reports his mother served five years for manslaughter in the 1990's for selling heroin to a man who overdosed—leaving Mr. Montanez to care for his siblings as a teenager.

5

https://www.nytimes.com/2011/06/21/us/21crime.html (accessed 7/13/20); Ivelaw L. Griffin, *The Political Economy of Drugs in the Caribbean*, 164-67 (New York, NY: St. Martin's Press, 2000)], available at, https://books.google.com/books?id=FRSHDAAAQBAJ&q=total+number+of+murder#v=onepage&q=murders&f=false (accessed 7/14/20)(chronicling crime of late 1980s in Puerto Rico). One Washington Post reporter noted that "throughout the 1970s, safety in the San Juan metropolitan area was comparable to that in similar-size cities in the continental United States. This changed in the 1980s, when Colombian cartels flooded the island with drugs. Criminal activity, no longer confined to drug hot spots, quickly spread throughout the San Juan metro area." Gretchen Sierra-Zorita, "*Drug Violence at America's Other Southern Border*," Wash. Post, November 24, 2011 available at https://www.washingtonpost.com/opinions/drug-violence-at-americas-other-southern-border/2011/11/23/gIQAw6uhtN_story.html (accessed 7/13/20). The available data is consonant with Mr. Montanez's lived experience: gun battles were common occurrences in Barrio Israel and Hato Rey, the two wards of San Juan Eric lived in. Mr. Montanae reports one instance where he was hiding under the bleachers at a baseball field and his mother summoned him; as he ran to her he looked up to the stadium lights to see a man with a high powered rifle perched there. Muzzle flashes were flashed were a common sight in the streets but the bodies of victims of gun and drug violence were as well. Not only was he isolated, he was isolated among terrors that no person should experience.

  Traces of this experience lurk in the present offense. First, there is clearly a basis for which any person may self-medicate with illicit drugs. Second, the distinguishing features of this offense resonate with his past: Eric hid his stigmatized habit from his fiancée and isolated himself in a car at night to commit this crime. Of all the crimes a person could commit, and all the ways he could commit

6

them, the isolation, the hiding, the loneliness, and the transience wreak of highly adaptive behavior that was learned somewhere. That somewhere was most likely on the streets of San Juan in the late 1980s. This is a significant mitigating fact.

### 2. Though somewhat less dramatic, Mr. Montanez's childhood before and after Puerto Rico was still highly dysfunctional.

The PSR also clearly indicates that Mr. Montanez's mother was in-and-out of jail for most of his youth. *PSR*, ¶67. Notably, Mr. Montanez regularly went hungry or had abysmal nutrition. *Id*. (survived on 2 bags of chips a day). In addition to this, he reports significant challenges at school as a result of being one of the few Puerto Rican children at his school: he was regularly challenged to fights and called racial slurs. Significantly, his mother was sentenced to significant time when Eric was approximately 15 which left to him to care for many of his siblings on his own. He worked as parking lot attendant and for UPS to make ends meet and dropped out of high school in the tenth grade.

### 3. In spite of all of these experiences, Mr. Montanez has held significant employment and climbed the career ladder; but that is also the source of injury that led him to pain pills.

The PSR notes that Mr. Montanez was employed with utility and infrastructure companies for most of 2014 to 2018. *PSR*, ¶77. Prior to 2008, Mr. Montanez was unemployed for a period of 6 years following a period of work at Connecticut Natural Gas. *Id*. Two points warrant emphasis.

First, Mr. Montanez traces his addiction to the use of prescribed pain killers he received to treat a back injury. *PSR*, 72. At Connecticut Natural Gas in 2007 and 2008, he helped in an effort to update gas meters. The meters were heavy and required significant lifting. As a result, Mr. Montanez suffered severe back pain and went to visit a specialist who began prescribing him opioid pain killers at seemingly irresponsible levels. Slowly but surely—and perhaps unwittingly, Mr. Montanez became

7

addicted to OxyContin. This is consistent with widely established trends in medicine and reporting on the origins of the opioid epidemic. *See e.g.* B. Meir "*Origins of an Epidemic: Purdue Pharma Knew Its Opioids Were Widely Abused*," N.Y. Times, May 29, 2018 available at https://www.nytimes.com/2018/05/29/health/purdue-opioids-oxycontin.html (accessed 7/14/20)(noting, *inter alia*, that OxyContin was promoted to doctors as "less addictive and prone to abuse than competing opioids…"); K. Benner, "*Snaring Doctors and Drug Dealers, Justice Department Intensifies Opioid Fight*,: N.Y. Times, Aug. 22, 2018, available at https://www.nytimes.com/2018/08/22/us/politics/opioids-crackdown-sessions.html?referringSource=articleShare (accessed 7/14/20). As noted in the *PSR*, Mr. Montanez struggled with this on his own but ultimately detoxed by himself and returned to work in 2014. Fundamentally, Mr. Montanez came to his addiction through hard work and medical treatment, not improvidence and abandon.

Second, Mr. Montanez's most recent job at United States Infrastructure Corporation (USIC) represented a high point and accomplishment in his life. *See PSR*, 76. When Mr. Montanez began this position, the company's name was Precision Pipeline Solutions. Mr. Montanez became a supervisor with that company after three months, an event he states usually takes a year, and received a nearly 40 percent raise. During this time, Mr. Montanez arrived rather decidedly in the middle class. He was taking care of this family, healthy, and proud of his accomplishments. However, Precision was acquired by USIC which led to a reassignment of teams, changes in management, and—what sounds like—nepotism and territory issues. Mr. Montanez was laid off from the position on November 12, 2018.

Following that date, he relapsed on opioids and begin a downward spiral that brings him here. Weeks after losing this job, Mr. Montanez called the guy who buys phones.

8

### 4. Mr. Montanez's Drug Rehabilitation Effort Is A Significant Accomplishment Towards Rehabilitation.

In March of this year, Mr. Montanez completed something he had never done before: 45 days of inpatient drug rehabilitation. *PSR*, 74. Significantly, Mr. Montanez had initially been scheduled to complete 30 days but elected, on his own accord, to extend it by 15 days. This was a significant hardship for him insofar as it required him to draw a boundary between his needs and his family's. He, nonetheless, did so. Most notably, while at Grant Street, he was elected chairman of his group and charged with leading discussion and identifying inspirational readings to initiate the discussions. For a man who learned his behavior and coping mechanisms on the streets alone, and for whom isolation is a coping mechanism, this demonstrates an extraordinary turnaround.

Importantly, the defense does not dispute that Mr. Montanez had struggles between his arrest in September of last year and January of the year. *See PSR*, 8. However, since Mr. Montanez decided to attend Grant Street, he has had no such struggles. Additionally, his initial reluctance to go was rooted in the understandable desire to support his finance and daughter. Though unemployed at the time, Mr. Montanez handled the bulk of the couple's child care so that his fiancée could work. Regardless, addressing his addiction has marked a monumental change in Mr. Montanez's life and demonstrates rehabilitation.

### 5. Conclusion.

Eric Montanez learned self-reliance and stoicism at a perilously young age. There was no one no to provide for him as a child nor was there anyone to console him as he endured trauma after trauma. He learned to care for himself as a child, his siblings as a teenager, and his family as an adult. He kept quiet about his adverse experiences—fending off one round of opioid addiction on his own. He forged an identity at each stage as a taciturn provider. But in November of 2018, Mr. Montanez

was stripped of the identity—or at least the provider part. Rather than seek help, he retreated in his addiction and turned to the streets for financial subsistence. He now finds himself here. This history and circumstance deeply informs the present offense.

### C. Guidelines Calculations.

As the Court is well aware, it is obligated to consider the United States Sentencing Guidelines. *See United States v. Booker*, 543 U.S. 220 (2005). Therefore, the defense briefly addresses them. It gives the bulk of its attention to criminal history category. Significantly, Mr. Montanez has no objection to the guidelines calculation as stated in the presentence report.

Two points regarding the criminal history category warrant comment. First, the probation office has calculated Mr. Montanez's criminal history category as II whereas the plea agreement contemplates a category I. ¶ *PSR*, 54; *Plea Agreement*, 4. Clearly, the parties anticipated a criminal history category of I. Respectfully, the Court should use criminal history category I to give effect to the parties' negotiation of the plea agreement. *See United States v. Fernandez*, 877 F.2d 1138 (2d Cir., 1989); *see also United States v. Amico*, 416 F.3d 163, 167 (2d Cir., 2005)("'in order to preserve the integrity of plea bargaining procedures and public confidence in the criminal justice system, a defendant is generally entitled to the enforcement of a plea agreement without showing a tangible harm resulting from a breach'"). Importantly, Mr. Montanez's *only* conviction is for a State of Connecticut Larceny in the Fourth Degree offense for which he was serving a *conditional discharge* as opposed to probation. As the Court is likely aware, conditional discharge in Connecticut is given where: (1) extended incarceration is not appropriate; and (2) "*probation supervision is not appropriate*." C.G.S. §53a-29(b). Guideline §4A1.1(d) states that a person receives two additional criminal history points "if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or

escape status." Comment note 4 states that a "*'criminal justice sentence'*" means a sentence countable under §4A1.2… *having a custodial or supervisory component*, although active supervision is not required for this subsection to apply. U.S.S.G §4A1.1 n. 4 (emphasis added). There is neither a custodial nor supervisory component to a conditional discharge in Connecticut. The defense does not dispute that there was a *suspended* portion of the sentence that was custodial; nor that the final clause ("active supervision not required") could broaden the reading of the guideline. But that does not completely solve the problem. The guideline is clearly, on its face, directed at recidivists who failed under supervision. Similarly, the "active supervision" clause of the guideline fails to distinguish between those who *were on active supervision but were converted to administrative monitoring* and those who receive no active supervision at all. Mr. Montanez was the latter. However, were the Court to ignore this distinction, the two point enhancement would apply just as much to Mr. Montanez as it would to a person who served three years of *active* supervised release for a serious crime—receiving all the rehabilitative benefits, was converted to administrative supervision, and then committed the same crime. Clearly there is a stark distinction in culpability between the two. The two point enhancement vastly overstates this.

Second, Mr. Montanez only registers *one* misdemeanor conviction on his record: the timing of this conviction and the balance of the arrests listed in the *PSR* must be considered in chronological context. This analysis is multifaceted. First, the fact that Mr. Montanez was arrested on multiple occasions is insignificant because none of the arrests resulted in convictions: he is entitled to the presumption of innocence. Second, it appears all of Mr. Montanez's charges, besides the one conviction, were nolled and there is no evidence he used a diversionary program. However, even if he had, the Connecticut Supreme Court has said: "on the basis of the language of § 54-56e [a Connecticut diversionary statute] and its legislative history, it is clear that an eligible accused may

avail herself of the obvious benefits of avoiding protracted and potentially damaging litigation without having to admit guilt and without any requisite finding of guilt." *AFSCME, Council 4, Local 1565 v. Department of Corrections*, 298 Conn. 824, 846 (2010). Accordingly, there is no basis to count these arrests pursuant to §4A1.2(f). Similarly, the same court noted that, as a result of the state's erasure statute, C.G.S. §54-142a(e)(3), a person who receives a nolle, "*would lawfully be entitled to testify under oath that they* [sic] *had never even been arrested.*" *AFSCME, Council 4*, supra, at 845 (emphasis in original). Mr. Montanez has the right to deny the balance of his Connecticut arrests.

Finally—regardless of the legal treatment of the arrests and single conviction, they clearly corroborate Mr. Montanez's life story. As an adult, Mr. Montanez had no arrests nor convictions in 2007 to 2008, nor from 2014 to 2018. His early arrests—for shoplifting in 2011—occurred when he was unemployed and suffering from addiction. His more recent arrest and convictions resulted from a larceny in February of 2019. *PSR, ¶*51. Mr. Montanez does not get arrested when he is working and clean. Similarly, the February 2019 larceny, that led to the April 2019 conviction, clearly occurred during the same relapse and offense conduct as this case: it cannot seriously be said that Mr. Montanez is a *bona fide* recidivist. There was little to no opportunity for structured, supervised rehabilitation from his single conviction.

This is simply not a guidelines case. However, to the extent there is a temptation to treat Mr. Montanez as a recidivist, it should not govern because this is the first serious, adult encounter he has had with the criminal justice system. Mr. Montanez should be treated as a category I on account of the plea bargain, the fact that he only has *de minimus* convictions, and the fact that any criminal history overstates his prior opportunities for rehabilitation.

## II.  CONCLUSION.

Justice warrants a substantial downward departure or non-guidelines sentence. Mr. Montanez is functional adult when his life is working. When confronted with serious challenges, he reverts to the lonely child who raised himself in remarkably difficult circumstances. However, he has shown a remarkable capacity to rehabilitate himself and accept the aid of others. Accordingly, a sentence that reflects these circumstances and insights is warranted.

Respectfully Submitted,

/s/Daniel M. Erwin/s/
By Daniel M. Erwin (ct28947)
FEDERAL DEFENDER'S OFFICE
10 Columbus Boulevard, 6th Floor
Hartford, CT 06106
Tel: (860) 493-6260
Fax: (860) 493-6269
Email: Daniel_Erwin@fd.org

### CERTIFICATION OF SERVICE

This is to certify that on July 14, 2020, a copy of the forgoing was filed electronically via the Court's CM/ECF system, and by that system, counsel for the Government has been provided with a copy of the forgoing.

/s/Daniel M. Erwin/s/
Daniel M. Erwin